## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MICHAEL A. OGLESBY,                )
                                   )
                  Plaintiff,       )
                                   )        CIVIL ACTION
v.                                 )
                                   )        No. 04-2440-KHV
HY-VEE, INC.,                      )
                                   )
                  Defendant.       )
_____)

### MEMORANDUM AND ORDER

Michael A. Oglesby brings suit against Hy-Vee, Inc., alleging employment discrimination, harassment and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #50) filed June 17, 2005. For reasons stated below, the Court sustains the motion.

### I.    Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743

(10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith." To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e). Maverick Paper Co. v.

Omaha Paper Co., Inc., 18 F. Supp.2d 1232, 1234-35 (D. Kan. 1998).

## II.     Facts

The following facts are either uncontroverted or, where controverted, construed in the light most favorable to plaintiff:[1]

### A.     Plaintiff's Job At Hy-Vee

In 1990, plaintiff began working for Hy-Vee.  He was 39 years old.[2]  From 1990 to 1997, plaintiff worked at a Hy-Vee grocery store at 95th and Quivira Street as cashier, sacker, mid-afternoon stocker, supervisor and Ticketmaster salesperson.  Plaintiff also worked in the scanning department.  In August of 1997, when plaintiff was about 46 years old, he transferred to a Hy-Vee store at 91st and Metcalf and worked as scanning coordinator.  As scanning coordinator, plaintiff's duties included entering products into the scanning system, and making sure that ads hung correctly and prices rang up correctly.  Plaintiff typically worked on Tuesdays and Thursdays from 10:00 p.m. to 8:00 a.m. and on Saturdays and Sundays from 4:00 a.m. to 2:00 p.m.[3]  On some nights, plaintiff spent four to six hours working on a computer.  On Tuesday nights, he did not spend much time at the computer because he was busy hanging ads in the frozen foods, dairy, nonfoods and health and beauty areas.

The scanning office was located in back of the store and had a window and door which locked. It was a small office with three chairs and three computers.  A person could reach the door and light switch

---

[1]     Defendant's reply does not dispute any of plaintiff's additional facts in accordance with D. Kan. Rule 56.1(c).  Therefore, to the extent plaintiff's additional facts are relevant, they are deemed admitted.

[2]     Plaintiff was born on August 29, 1951.

[3]     Doug Hoestetler, the store director, created the schedule at plaintiff's request.

3

while sitting on the chair closest to the door.  On weekends, plaintiff shared the office with Dave Herrick, inventory manager.  Plaintiff considered Herrick a friend.

On Tuesday and Thursday nights, plaintiff typically worked with Jose Estrada, night stock manager.[4] As night stock manager, Estrada took care of the store during overnight hours and supervised ten or eleven crew members.  Although Estrada was the most senior person at the store during overnight hours, he never directly supervised plaintiff, i.e. he never told plaintiff what to do.  Plaintiff and Estrada considered each other friends, and Estrada never had any problems with plaintiff.  Estrada typically communicated with the store director through Dave Herrick, inventory manager.

On Tuesday and Thursday nights, Estrada regularly observed plaintiff working on the computer in the scanning office.  Estrada saw that plaintiff almost always left the office door open and the light on.  The only time that he observed the door closed and locked was when no one was in the scanning office.

### B.    Plaintiff's Relationship With Brett Bremser

In September of 2002, Brett Bremser, store director, talked to plaintiff about the "old-school Hy-Vee" where you "take the person to the product rather than just saying what aisle it's in."  The next week, in front of other managers, Bremser told plaintiff that he had been watching plaintiff for half an hour and that during that time, plaintiff had done nothing but "provide a friendly smile in every aisle."  Plaintiff could not believe that Bremser had just "jumped" him in front of other managers after they had just discussed "old-school Hy-Vee" where you take the customer to the product.[5]  The relationship between plaintiff and

---

[4]       When plaintiff arrived at 4:00 a.m. on Saturday mornings, Estrada was usually leaving the store.

[5]       Plaintiff does not explain how the old-school motto conflicts with reprimanding him in front
(continued...)

Bremser started to sour after that incident.  Plaintiff thought that Bremser tried to change everything when he became store director.  Bremser "rode" plaintiff and Denise Staffa, another scanning coordinator, about price changes and the way they put up signs.  Plaintiff did not have any other complaints about Bremser. They saw each other only on Saturdays and occasionally on Sundays.

### C.    Comments About Plaintiff's Age

#### 1.    John Martindale

In 2002, John Martindale, an employee in the seafood department, asked whether plaintiff's son called him dad or grandad.  This was the first comment that anyone at Hy-Vee made about plaintiff's age. After the comment, plaintiff had a long conversation with Martindale and Martindale did not make such a comment again.[6]

#### 2.    Dave Herrick

Beginning in 2002, Herrick made comments about plaintiff's gray hair every time they worked together.  Plaintiff responded that at least he had a full head of hair (referring to Herrick losing his hair) and showed Herrick the store policy on age discrimination and harassment.  More than once but less than 50 times, Herrick called plaintiff the "old man" of the store.  Plaintiff responded that if Herrick kept it up, Herrick would never be the old man of the store.  Once or twice, Herrick asked plaintiff about Moses parting the Red Sea.  Plaintiff told Herrick to read the Bible.  Several times, Herrick asked plaintiff how many bottles of Viagra he used a night.  Plaintiff responded that he did not need it.

---

[5](...continued)
of managers.

[6]        The record does not reveal the content of their conversation.

### 3.    Kevin Gorman

Plaintiff worked with Kevin Gorman two or three days a week, when their schedules overlapped for two to five hours.  In 1998, when plaintiff first began working at the Metcalf store, Gorman worked as a courtesy clerk.  In 2000, Hy-Vee promoted Gorman to manager.  Before Gorman became manager, he and plaintiff were friends.  After Gorman became a manager, plaintiff still considered Gorman a friend but believed that Gorman's attitude toward him had changed.  Sometimes plaintiff and Gorman talked about sports.

From 2002 to 2004, between one and 20 times, Gorman commented about plaintiff's gray hair. Gorman also asked plaintiff if he knew where the Grecian Formula was.  Plaintiff responded by asking if Gorman knew where the Rogaine was.  Several times, Gorman asked plaintiff how many bottles of Viagra he used a night.  Plaintiff does not remember when Gorman made the comments.  Three or four times, plaintiff called Gorman a "little pup."  Gorman is 30 years younger than plaintiff.

### 4.    Mike Langley

Plaintiff worked with Mike Langley three or four days a week, when their schedules overlapped a couple of hours.[7]  Langley commented several times that plaintiff's teeth "look just about like these corn nuts do."  Plaintiff responded, "You have a lot of room to talk.  At least I have all my teeth."

Every time they worked together, Langley commented about plaintiff's gray hair.  Plaintiff responded, "At least I have a full head of hair."  At least 10 times during 2002, Langley made comments about plaintiff's hip such as: "What's the matter, did your wife kick you out of bed or throw you off the bed?"  "Did you slip and fall and break your hip old man?"  "Bones don't heal as fast as they did when you

---

[7]        The record does not reflect Langley's position.

6

were younger, do they?" Langley also asked plaintiff if he knew where the Grecian Formula was. Plaintiff responded by asking if Langley knew where the Rogaine was.

### 5. Kevin Schumacher

Plaintiff worked with Kevin Schumacher, assistant manager, about two days a week, when their schedules overlapped at least a couple of hours. Hy-Vee terminated Schumacher's employment on May 4, 2003.

Schumacher constantly made comments like: "Hey old man. How's it going? How's your son or grandson. What do you call him at home?" Schumacher also commented several times about how young plaintiff's wife was compared to plaintiff. Plaintiff responded that his wife was over the legal age of 21. Plaintiff also told Schumacher that his wife had "chased him" by asking him out two or three times after they first met. Schumacher asked plaintiff if he knew where the Grecian Formula was. Plaintiff responded by asking if Schumacher knew where the Rogaine was. Between Gorman, Langley and Schumacher, plaintiff received questions about Grecian Formula at least once a week.

### 6. Dale Mitchell

Plaintiff worked with Dale Mitchell, assistant manager of perishables, on weekends and occasionally on Tuesday nights.[8] Plaintiff and Mitchell regularly discussed the rivalry between the University of Kansas and the University of Missouri. Plaintiff considered Mitchell a work acquaintance, but not a friend.

Mitchell was always "riding" plaintiff about being the old man of the store. Mitchell said that plaintiff was getting old and could not get the job done in eight or nine hours like he was supposed to. Mitchell told plaintiff, "I think you're getting old. That's why you're slowing down so much. That's why it takes you so

---

[8]     The record does not reflect Mitchell's position.

7

long to do the ad."  Mitchell called plaintiff "old man with the gray hair."  About ten times over a three-year period, Mitchell asked plaintiff if the dinosaurs really were as big as they say they were.  Mitchell also asked plaintiff how many bottles of Viagra he used a night.  Plaintiff responded that he did not need it.

### 7. Jose Estrada

Estrada called plaintiff "abuelo" – the Spanish word for grandfather – all the time.

### 8. Other Comments

Many employees aged 16, 17 or 18 made comments about plaintiff's age such as: "You're older than my dad" and "my mom's the same age as you."  Plaintiff more or less overlooked the comments because of the age of the employees and because they did not know store policies or that it was making plaintiff mad and interfering with his job performance.

Henry, an employee in the bakery, called plaintiff "old man."  Plaintiff blew off the comment because Henry was older than plaintiff.

In early 2003, Matt Mohoney, an assistant manager, left memory mints on plaintiff's desk.  Plaintiff laughed about it.

Anonymous people left greeting cards about age on plaintiff's desk.  Plaintiff returned the cards to the shelf to be sold.

### 9. Brett Bremser

Bremser never commented negatively about anyone's age at Hy-Vee.  On one occasion, Bremser heard employees make comments to plaintiff like, "Here comes the old man.  Hope he's in a good mood today."  Plaintiff looked at Bremser but he did not say anything.  Bremser did not hear any other comments about plaintiff's age, and no one told Bremser that they had heard comments about plaintiff's age.

In 2003, plaintiff attempted to bid for jobs outside the Metcalf store. He bid for a scanning position at another location, but the employee at that location decided not to leave so the position closed. Plaintiff also bid for a job at the Prairie Village store as gas station manager. Bremser told plaintiff that he did not have permission to leave the store and that Bremser was surprised that plaintiff had applied for the position at the Prairie Village store. Plaintiff did not receive an interview for the position.

### D.    Store Atmosphere

Plaintiff joked with fellow employees about various things. He brought in e-mails which his wife had received with different jokes, including blonde jokes. Plaintiff called one joke "an oldie but goody." Plaintiff kept a stack of such jokes at his desk for others – including Herrick, Carrie Russell, Twila Meyer and Sharon Flourney, assistant manager – to read.

Herrick, Gorman, Langley, Schumacher and Mitchell, all of whom were younger than plaintiff, called plaintiff "grandpa." They continued even after they realized how much it upset plaintiff.

Meyer heard employees make many age-related comments to plaintiff. Meyer testified that the comments were made in a joking manner but that they were not humorous and that they hurt and upset plaintiff.

Flourney testified that she heard Langley, Mahoney, Schumacher, Herrick and Gorman call plaintiff "old man." Flourney stated that she would hear such comments after plaintiff had made a mistake and was corrected for it, and that the comments really bothered plaintiff so she would talk to him about it.[9] Flourney stated that plaintiff would try to say something back about their young age to make them laugh.

At first, the old man comments did not offend plaintiff. Over time, however, the comments became

---

[9]    The record does not reflect the content of their conversations.

9

more vicious and annoying to him.  Plaintiff was very much offended when someone asked him in front of his son whether his son called him dad or grandpa.  The comments wore on plaintiff's nerves over a period of time.  Plaintiff still performed his job efficiently, but the comments made it more difficult for him to do the work because they affected how he felt on the job.

At least 20 people who worked at the Metcalf store were older than plaintiff.  Plaintiff knew that a couple of employees were older than him.  Plaintiff never heard anyone make comments to those employees.

### E.     Hy-Vee Policies

Hy-Vee policy prohibits harassment and discrimination because of age.  Plaintiff was aware of such policy.  The policy provided that if an employee had a complaint about discrimination or harassment, he should bring the complaint to the department head, assistant store director, manager of store operations, manager of perishables, manager of general merchandise, store director, vice president of human resources or any other vice president.  If the employee believed that his complaint was not taken seriously, Hy-Vee encouraged him to complain to another person on the list.

Hy-Vee has an unwritten policy of progressive discipline which provides the store director discretion as to what discipline to impose for a particular offense.  Under this policy, Bremser has given employees verbal and written warnings.

If an employee left work during his or her shift without clocking out, the employee would violate Hy-Vee policy.

### F.     Plaintiff's Complaints To Others

Plaintiff complained about age discrimination/harassment to Carrie Russell, manager of store

operations, Herrick, Gorman, Mitchell and Joel Allen, manager of store operations.

In the spring of 2002, plaintiff complained to Russell that he was sick and tired of being called the old man of the store, that he did not appreciate remarks about his gray hair, and that calling him grandpa was way out of line.[10]  Russell responded that she would talk to "the boys" about it.  After the complaint, Russell stopped making age-related comments to plaintiff but she did nothing to prevent other employees from doing it.

Prior to March of 2003, plaintiff again complained to Russell about age-related cards and memory mints which people left for him.

Beginning in 2002, plaintiff showed Herrick the company discrimination policy two to six times.  Herrick laughed and told plaintiff that he would get back with him.  About six times when Herrick made age-related comments, plaintiff asked him to "cool it."  Plaintiff does not remember when he complained to Herrick.

Twice in 2003, plaintiff showed Gorman the company discrimination policy and told him, "It has

_____

[10]     The parties dispute when plaintiff complained.  Plaintiff contends that he complained "as it happened."  Defendant maintains that he complained in the early spring of 2002.  Both parties rely on plaintiff's deposition testimony, which is somewhat ambiguous.  Plaintiff testified that employees made old-age remarks from the winter of 2002 until he was fired in 2004.  Plaintiff's Depo. at 72:21-23.  Plaintiff stated that he complained to Russell "as it happened," id. at 73:2-7, and that Russell stated that she would try to talk to the boys.  Id. at 73:23-25.  Defense counsel then asked plaintiff, "When was it that you talked to her, did you say?"  Id. at 74:1-2.  Plaintiff responded, "Sometime in the early spring of 2002."  Id. at 74:3.  In response to counsel's question whether the situation improved after the complaint, plaintiff stated as follows: "Actually, no.  Except for Carrie.  She quit making those comments, however, she did nothing else to prevent it from the other employees."  In ruling on defendant's summary judgment motion, the Court must construe the record in the light most favorable to plaintiff.  Under this standard, the deposition testimony, read as a whole, supports defendant's position that plaintiff complained to Russell in the spring of 2002.

11

to stop because if it doesn't I'm going to go to corporate with it." Plaintiff's Depo. at 126:21-127:19.[11] Gorman laughed in response.

Also in 2003, plaintiff complained to Mitchell several times. Plaintiff showed Mitchell the discrimination policy and told him that he needed to read the policy and abide by it.

In March of 2003, plaintiff complained to Allen that he was tired of comments about his gray hair and being called "old man," and that he was tired of showing people Hy-Vee's age discrimination and harassment policies. Plaintiff does not remember how Allen responded.

In July or August of 2003, the age-related comments became vicious and plaintiff again complained to Russell. Plaintiff was afraid to tell Bremser because he was afraid that Bremser would fire him.

### G.      Termination Of Plaintiff's Employment

During overnight hours of Tuesday, March 2, 2004, Estrada needed a box cutter from the scanning office. During his deposition and in his affidavit, Estrada stated as follows: When he approached the scanning office, the door was locked and the light off. Estrada did not know that plaintiff was inside and after he turned around to leave, he heard plaintiff open the door and saw that the light was on. Plaintiff looked like he had been asleep. Plaintiff was sitting in two chairs and had reached up to turn on the light. Estrada retrieved the box cutters, turned off the light and left the office. Plaintiff remained in the office. See Estrada Affidavit, defendant's exhibit 2; Estrada Depo. at 12:11-24, Defendant's Exhibit 7. Estrada did not see plaintiff again until an hour and a half later. At 5:30 or 6:00 a.m. on Wednesday, March 3, 2004, Estrada told Herrick that he had observed plaintiff sleeping on the job for 20 to 30 minutes.

---

[11]      Plaintiff does not recall when in 2003 he complained to Gorman, except that it was warm outside. Plaintiff's Depo. at 127:9-14.

Estrada also reported the incident to Joe Allen, manager of store operations.  Allen completed an employee consultation form on behalf of Estrada, who does not read English well.[12]  Estrada signed the document, which states as follows:

> Michael Oglesby was sleeping on the clock when Jose went to the backroom to get a box knife at 1:30 A.M.  Jose turned on the lights to find the knife.  After Jose left Mike woke up and shut the door and turned off the light and went back to sleep.  Jose said Mike did not return to work until 3:00 a.m.
> Jose said Mike had 2 chairs together that he was sleeping on.

Plaintiff's Exhibit H.  Although the consultation form states that Estrada "turned on the lights to find the knife," Estrada stated in his deposition that plaintiff turned on the light.  See Estrada Depo. at 22:11-18.  Allen testified, however, that Estrada said that Estrada turned on the light, not plaintiff.  See Allen Depo. at 25:10-13, Plaintiff's Exhibit J.  Estrada testified that he did not say that plaintiff went back to sleep, but that it looked like plaintiff was asleep.  Estrada had the impression that plaintiff had just woken up, but he did not actually see plaintiff sleeping.  Estrada does not know whether plaintiff was resting his eyes instead of sleeping.

On Friday, March 5, 2004, Allen told Bremser that Estrada had seen plaintiff sleeping in the back office for an extended period of time.  This was the first time that Bremser heard about the incident.  Bremser understood that the event occurred on the last day on which plaintiff had worked.  Although plaintiff normally worked on Thursdays, he did not work on Thursday, March 4, 2004.

Upon Bremser's request, Estrada came to the store and met with Bremser.[13]  According to

---

[12]     The consultation form is dated March 6, 2004.

[13]     Estrada testified that Bremser asked whether the story he told Herrick was true.  See Estrada Depo. at 19:24 to 20:3.

Bremser, Estrada told him the following facts:

> [O]n the last night Mr. Oglesby worked, Mr. Estrada went to the scanning office to get a box cutter and found the door locked. Mr. Estrada did not have a key and turned to walk away. As he was leaving, he heard some noise. . . . [Estrada] turned back around and saw the light turn on, and Mr. Oglesby opened the door. . . . [Estrada] saw Mr. Oglesby sitting in two chairs, and it appeared he had been sleeping. . . . [When Estrada] left the office after getting the box cutter, Mr. Oglesby shut the door, turned off the light and remained in the office for an hour and a half.

Bremser Affidavit ¶¶ 10-11, Defendant's Exhibit 6. Bremser checked time records to see if plaintiff had checked out for hour lunch during the week of March 1, 2004. He examined plaintiff's time card for four punches on one day, which would indicate that plaintiff had punched out and then punched back in. He also checked the edit sheets to see whether plaintiff had written down a lunch hour which he had forgotten to clock out. The results were negative.

On the morning of March 6, 2004, Bremser asked plaintiff to come to his office. When plaintiff arrived, Bremser closed the door and asked him to tell about the four hours on Tuesday when he was sleeping in the office. See Plaintiff's Depo. at 136:10-22, Defendant's Exhibit 1A. Plaintiff replied that it would have impossible for him to sleep four hours on Tuesday because he had worked with Twila Meyer hanging a huge ad that day. Plaintiff stated that he was not asleep at any time on Tuesday, but that he may have been resting his eyes. Bremser replied, "Well it may have been Thursday. But it doesn't matter, you're fired anyway. I believe my night stock manager. He says he saw you sleeping. You were sleeping." Plaintiff's Depo. at 139:1-4. Plaintiff offered to drive to Des Moines, Iowa, to be interviewed by corporate security. Bremser stated that was not necessary and to get out of his office.

Bremser completed an employee termination report which stated the following reason for separation: "Theft of time. Employee was found to be sleeping for extended period of time while on the

clock." Defendant's Exhibit 11. Bremser did not seek anyone's advice or input before deciding to terminate plaintiff. Bremser had never fired or disciplined anyone else for sleeping or napping on the job.

After speaking with plaintiff, Bremser became confused about which day plaintiff was sleeping on the job. He and Estrada had not discussed the date, but Bremser understood it was the last day on which plaintiff worked, which Bremser believed to be Thursday. After speaking with plaintiff, however, Bremser was not sure what day it was.

On the day he was fired, plaintiff told Herrick that he was sick and tired of the age discrimination and harassment.[14] Plaintiff stated, "I've been pushed too long, too hard, and I'm writing a letter to corporate." Herrick asked what plaintiff was referring to, and plaintiff responded "about the age-related comments." Plaintiff stated that he planned to write a letter to Charlie Bell, vice president of Hy-Vee, about the comments.

Plaintiff believes that Bremser fired him because he told Herrick that he was going to complain to the corporate office. Bremser had once admonished plaintiff for contacting the corporate office about an insurance question. Bremser testified that he did not know about plaintiff's intent to send a letter to corporate about age harassment.

Plaintiff did not contact Bell or anyone else at the corporate office before he was fired. After his discharge, plaintiff left a voice mail message for Bell which stated that he was "unjustifiably terminated for sleeping on a day that he was not there" and that "after 14 years he couldn't believe that they would do that to a quality employee."

---

[14]    Plaintiff testified that he made the comment before he was fired. See Plaintiff's Depo. at 146:3-7.

On March 22, 2004, plaintiff wrote a letter to Bell which stated as follows:

This is a letter to confirm and follow up on my call to file a formal complaint against Brett Bremser for unjustifiable termination.

Accusations were made to the fact that I had been asleep on the job. In light of these accusations Brett has not been able to show me adequate proof of the day that I fell asleep on the job. On March 6, 2004, Brett had me come to the office and stated he was firing me effective immediately.

Plaintiff's Depo. Exhibit 17, Plaintiff's Depo. at 219:5-13.

Plaintiff admits that he sometimes "rested his eyes" while on the job at Hy-Vee. When plaintiff rested his eyes, he almost always had the scanning office door shut. Sometimes the light was on and sometimes he turned it off. Bremser was not aware that plaintiff had rested his eyes on other occasions.

From 2000 to December of 2003, Twila Meyer worked with plaintiff as night manager two nights a week. In December of 2003, Meyer became a scanning coordinator and worked with plaintiff on Wednesday mornings. Meyer has never seen plaintiff sleeping on the job. About three or four times, Meyer observed plaintiff resting his eyes for about 20 minutes during his break.

Meyer worked the evening of Tuesday March 2, 2004, beginning around midnight. That night, Meyer and plaintiff hung the Easter ad. Meyer observed plaintiff working "pretty frequently" that morning. She never saw him resting his eyes. Myer testified that she knows that plaintiff was not sleeping from 1:30 to 3:00 a.m. because she always takes a cigarette break at 2:00 a.m., and she would have noticed if the light in the scanning office was off. The scanning office light was on when she took her break.

For an eight hour shift, Hy-Vee employees can take two 15 minute breaks or one half-hour break. For a ten hour shift, employees can take two 20 minute breaks or one 40 minute break. It is not against store policy for employees to rest their eyes or sleep while they are on a break. Sleeping while on a break

16

is not grounds for termination.

Plaintiff was an excellent employee with no prior disciplinary problems.  On April 21, 2004, Bremser received a letter from the Hy-Vee corporate office which stated that the store had 100 per cent scanning accuracy.

Hy-Vee hired Belinda Siler to replace plaintiff as scanning coordinator.  Siler, who was born on March 31, 1957, is five years and seven months younger than plaintiff.

### H.    Hy-Vee's Treatment Of Other Employees

#### 1.    Christopher Wisdom And Raymundo Santos

Bremser fired Christopher Wisdom and Raymundo Santos for theft of time.  Wisdom, who was 24 years old, was fired for time clock fraud, i.e. for writing down false time entries which were earlier than when he actually clocked in.  Santos, who was 31 years old, was fired for "stealing time."[15]

#### 2.    Jose Estrada

While Estrada was on the clock, Flourney observed that he would sometimes come to work and get his crew together to stock the shelves and then leave work and return later.  Flourney was going to inform the store manager, but Kevin Gorney told him that he had already done so.  Dale Mitchell heard a rumor that Estrada sometimes left work during his shift without clocking out.  Mitchell did not take any action as a result of the rumor.  He does not know whether anyone else did.  Such conduct by Estrada could be considered "theft of time" which could result in termination under store policy.  Estrada did not receive any discipline for violating this work rule.

#### 3.    Kevin Schumacher

---

[15]        The record provides no additional facts regarding the reason for Santo's discharge.

Schumacher worked as assistant manager at the Metcalf store from March 5, 2001, until he was fired April 17, 2003.  At the time of his discharge, Schumacher was 45 years old.  On May 23, 2001, Schumacher received a written warning for sexual harassment.  The warning stated that "should there be any other situation Kevin knows he could lose his job."  On December 28, 2001, Schumacher received another warning for sexual harassment which stated as follows: "This is the second time Kevin has been talked to regarding comments.  Next time will be termination."  On September 12, 2002, Schumacher received a third written warning for grabbing a female employee's breast.  For this incident, Hy-Vee suspended his employment for one week.  Hy-Vee ultimately fired Schumacher in April of 2003 for grabbing young male employees.

### 4.    Twila Meyer

On July 17, 2004, Bremser demoted Meyer, a long term employee who was over the age of 40, from her job as scanning coordinator.  Because of a computer pricing error, Bremser demoted Meyer to the part-time position of courtesy clerk, which paid $7.00 an hour and did not include benefits.  Before the demotion, Meyer had no prior disciplinary write-ups.  Meyer resigned as a result of the demotion.  Bremser hired Edie Unkenholtz, who was 25 years old, to replace Meyer as scanning coordinator.  A week after Meyer resigned, Bremser said in a managers meeting that the pricing error resulted from a computer glitch and was not Meyer's fault.

## III.    Analysis

Defendant seeks summary judgment on plaintiff's claims of age discrimination, harassment and retaliation.  Specifically, defendant contends that (1) plaintiff cannot establish a prima facie claim of age discrimination; (2) plaintiff cannot show that defendant's reason for its action is pretextual; (3) plaintiff

cannot establish that the alleged harassment was sufficiently severe or pervasive to alter a term or condition of employment; (4) plaintiff cannot recover damages based upon age harassment; and (5) plaintiff cannot prove retaliation. Plaintiff concedes that defendant is entitled to summary judgment on his retaliation claim. See Plaintiff Michael A. Oglesby's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Opposition") (Doc. #55) filed July 26, 2005 at 44-45. The Court therefore enters summary judgment on that claim.

### A.    Age Discrimination

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on his ADEA claim, plaintiff must establish that age was a determining factor in the challenged decision. See Greene v. Safeway Stores, Inc., 98 F.3d 554, 557 (10th Cir. 1996) (citing Lucas v. Dover Corp., 857 F.2d 1397, 1400 (10th Cir. 1988)). Plaintiff need not show that age was the sole reason, but he must show that age "made the difference" in any adverse employment action. Id. (quoting EEOC v. Sperry Corp., 852 F.2d 503, 507 (10th Cir. 1988)). Plaintiff may meet this burden by direct evidence of age discrimination or by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), and Tex. Dep't of Comm'y Affairs v. Burdine, 450 U.S. 248, 252-56 (1981). See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000). In this case, plaintiff does not argue that he has direct evidence of age discrimination.[16] See Plaintiff's Opposition at 26-37. Therefore, the Court

---

[16]    Although plaintiff presents evidence that other employees commented about his age, he presents no direct evidence that Bremser discharged him because of age. See Ramsey v. City & County

(continued...)

analyzes his claims under the McDonnell Douglas burden-shifting framework.

Under McDonnell Douglas, plaintiff initially bears the burden of production to establish a prima facie case of discrimination.  411 U.S. at 802.  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.  See Reynolds v. Sch. Dist. No. 1, 69 F.3d 1523, 1533 (10th Cir. 1995)  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."  Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)).

### 1.    Prima Facie Case

Defendant contends that plaintiff cannot establish a prima facie case of age discrimination. Generally, to establish a prima facie case of age discrimination in termination or reassignment, plaintiff must show that (1) he was a member of the protected age group, over age 40; (2) he was doing satisfactory work; (3) he suffered an adverse employment action; and (4) defendant filled his position with a younger person.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).  Defendant contends that plaintiff cannot show the fourth element, i.e. that it hired a substantially younger person to replace him.  Specifically, defendant states that it replaced plaintiff with Siler, who was five years and seven months younger than plaintiff, and that the age difference between plaintiff and Siler is insufficient to establish a prima facie case.

---

[16](...continued)
of Denver, 907 F.2d 1004, 1007-08 (10th Cir. 1990); Simmons v. Kansas City Psychiatric Group, P.A., No. 03-2614, 2004 WL 2810104, at *4 (D. Kan. Dec. 4, 2004) (statements by employee other than actual decision-maker not direct evidence of discrimination).

In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996), the United States Supreme Court noted that to establish a prima facie case of age discrimination, plaintiff must produce evidence sufficient to create an inference that defendant based its employment decision on age.  See id. at 312.  With respect to the fourth element, the Supreme Court held that plaintiff need not show that defendant replaced him with an employee outside the protected class, i.e. under 40 years old.  Id. at 312.  Rather, the Supreme Court held that to create an inference of age discrimination with respect to the fourth element, plaintiff must show a significant age difference between him and the worker who replaced him.  See id. at 313.

The Tenth Circuit has ruled that a two year age difference is "obviously insignificant" for purposes of the fourth element of the prima facie case.  Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1166 (10th Cir. 2000).  The Tenth Circuit, however, has not addressed at what point an age difference greater than two years becomes significant.  Other courts are split on whether a five to six year difference is significant.  See Benjamin v. E.I. Du Pont De Nemurs & Co., No. 02-4167, 75 Fed. Appx. 65, (3d Cir. 2003) (seven year gap sufficient); Grosjean v. First Energy Corp., 349 F.3d 332, 340 (6th Cir. 2003) (absent direct evidence that employer considered age significant, difference of six years or less insufficient); Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000) (three year difference insufficient); Radue v. Kimberly-Clark Corp., 219 F.3d 612, 619 (7th Cir. 2000) (replacement must be at least ten years younger to satisfy substantially younger requirement although plaintiff may still present triable claim if he directs court to evidence that employer considered age to be significant factor); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (five year age difference sufficient); Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1997) (three years sufficient); Schlitz v. Burlington N.R.R., 115 F.3d

1407, 1413 (8th Cir. 1997) (five years insufficient); <u>Perez-Cruet v. Principi</u>, No. CIV-4145C, 2005 WL 1331097, at \*7 (W.D. Okla. 2005) (six years sufficient under Tenth Circuit precedent); <u>Kitchen v. Burlington N. & Santa Fe Ry. Co.</u>, 298 F. Supp.2d 1193, 1200-91 (D. Kan. 2004) (VanBebber) (six years insufficient); <u>Housley v. Boeing Co.</u>, 177 F. Supp.2d 1209, 1215 (D. Kan. 2001) (Lungstrum) (four years insufficient); <u>Robinette v. Nat'l Credit Servs. Corp.</u>, 182 F. Supp.2d 1055, 1058 (D. Kan. 2001) (Murguia) (seven years sufficient).  For purposes of ruling on defendant's motion for summary judgment, the Court assumes without deciding that plaintiff has satisfied the fourth element of a prima facie case.

## 2.    Pretext

Defendant states that it fired plaintiff due to Estrada's report that he had slept on the job.  Because defendant states legitimate nondiscriminatory reasons for its action, the burden shifts to plaintiff to show evidence of pretext.  Evidence of pretext may take a variety of forms.  <u>See</u> <u>Aramburu v. Boeing Co.</u>, 112 F.3d 1398, 1411 n.10 (10th Cir. 1997).  Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).  Typically, a plaintiff demonstrates pretext with evidence that (1) defendant's stated reason for the adverse action was false; (2) defendant acted contrary to written company policy prescribing the action to be taken by defendant under the circumstances; or (3) defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse decision.  <u>See</u> <u>Kendrick</u>, 220 F.3d at 1230.  Plaintiff can show pretext under the third category by showing that defendant treated him differently from other similarly situated employees who violated work rules of comparable seriousness.  <u>See</u> <u>id.</u> (citing <u>Aramburu</u>, 112 F.3d at 1404).

22

Plaintiff contends that defendant's stated reason for termination is false.  Specifically, plaintiff denies that he slept on the job and states that Estrada's version of events lacks credibility.  Plaintiff contends that Estrada has changed his story several times.  First, Estrada told Mitchell that he saw plaintiff sleeping for 20 to 30 minutes.  Later, Estrada reported that plaintiff had slept for an hour and a half.  Plaintiff also contends that Estrada gave conflicting statements whether he or plaintiff turned on the lights.  In determining whether defendant's stated reason is pretextual, the Court examines the facts as they appeared to Bremser, the person who made the decision to terminate plaintiff's employment.  See Kendrick, 220 F.3d at 1231; see also EEOC v. Flasher Co., 986 F.2d 1312, 1322 n.12 (10th Cir. 1992) (mistaken belief can be legitimate reason for employment decision and is not necessarily pretextual).  Plaintiff points to no evidence which demonstrates that Bremser had knowledge of such discrepancies at the time he made the termination decision.[17]  Thus the record does not support an inference that defendant's stated reason for the discharge is pretextual.

Plaintiff argues that defendant acted contrary to its unwritten policy of progressive discipline.  Specifically, plaintiff points to Schumacher, who received two verbal warnings and three written warnings before Bremser fired him.  The record indicates that Hy-Vee had an unwritten policy of progressive discipline which provided the store director discretion as to what discipline to impose for a particular offense.  The fact that Bremser warned one employee before firing him for sexual harassment does not show that Bremser violated the policy by firing plaintiff for sleeping on the job.  By its terms, the policy is discretionary and does not require Bremser to treat the two offenses similarly.  Plaintiff has not created a

---

[17]       Plaintiff contends that defendant's confusion over the date on which he slept on the job shows pretext.  On these facts, however, the actual date of the offense is immaterial to whether defendant's stated reason is pretextual.

material fact issue in this regard.

Plaintiff asserts that defendant treated him differently from other similarly situated employees. Specifically, plaintiff argues that Schumacher received five warnings (two verbal and three written) before he was fired and plaintiff received none.  Plaintiff has not shown, however, that Schumacher's conduct (sexual harassment) violated a work rule of comparable seriousness to plaintiff's alleged conduct (sleeping on the job).  See Kendrick, 220 F.3d at 1230 (citing Aramburu, 112 F.3d at 1404).  Plaintiff argues that Bremser did not discipline Estrada for leaving work without clocking out, but the record contains no evidence that Bremser was aware of Estrada's alleged conduct.  On this record, plaintiff has not created a fact issue as to whether defendant treated him differently than similarly situated employees.

Finally, plaintiff argues that defendant engaged in a pattern of terminating older employees.  In support of this argument, plaintiff cites Greene v. Safeway Stores, Inc., 98 F.3d 554 (10th Cir. 1996), which involved significantly different facts.  In Greene, plaintiff presented evidence that within 12 months of installing a new president, defendant replaced eight top-level executives with younger persons. The Tenth Circuit found that such evidence was sufficient to support an inference that age was a determining factor in the decisions.  Here, plaintiff points to only one other employee, Meyer, who was fired four months after him.  The fact that defendant fired one other employee within four months, standing alone, does not create an inference of discrimination.  Plaintiff has not presented a triable issue of fact regarding pretext. Accordingly, defendant is entitled to summary judgment on his age discrimination claim.

### B.    Age Harassment

Defendant asserts that even if plaintiff can prove that it subjected him to a hostile work environment, he cannot recover damages on such claim.  Specifically, defendant contends that the ADEA permits

damages for only specifically enumerated economic losses and that plaintiff has suffered no such loss as a result of the alleged harassment.[18]  The Court agrees.  With respect to damages under the ADEA, Section 626(b) provides as follows:

> * * * In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section. * * *

29 U.S.C. § 626(b).[19]

Despite broad language that courts "shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter," the Tenth Circuit has found that the ADEA allows damages for only those items specified under Section 626(b), i.e. equitable relief or amounts deemed to be unpaid minimum wages or unpaid overtime compensation.  See Perrell v. FinanceAmerica Corp., 726 F.2d 654, 657 (10th Cir. 1984) (district court erred in allowing jury to consider items of damage other than those specifically enumerated in ADEA).  Other circuits concur in this result.  See Comm'r of IRS v. Schleier, 515 U.S. 323, 326 n.2 (1995) (circuit courts have unanimously held that ADEA does not permit separate recovery for pain and suffering or emotional distress).

Plaintiff argues that the Court should permit him to recover damages for emotional distress because such damages "are a necessary part of the recovery for a hostile work environment claim under Title VII,

---

[18]     Defendant also contends that plaintiff cannot show that unwelcome age-based conduct was sufficiently severe or pervasive to alter a term or condition of employment.  The Court does not reach this issue because it finds that even if plaintiff could establish such conduct, he cannot recover non-economic damages under the ADEA.

[19]     Section 626(b) also provides for liquidated damages in cases of willful violations.

and the court should likewise permit their recovery under the ADEA to carry into effect the statute's purpose of preventing and remedying discrimination because of age." Plaintiff's Opposition (Doc. #55) at 44. As an initial matter, plaintiff's failure to claim damages for emotional distress in the pretrial order precludes his ability to do so at this time. See Pretrial Order (Doc. #49) filed June 8, 2005 at 4, 11 (plaintiff seeks lost wages and benefits, liquidated damages, front pay or reinstatement, attorney's fees and costs); D. Kan. Rule 16.2(c) (pretrial order controls subsequent course of action unless modified by consent of parties and court, or by court order to prevent manifest injustice); Gordon-Howell v. Penn-Plax, Inc., 232 F. Supp.2d 1251, 1256 n.5 (plaintiff abandoned claim by not asserting it in pretrial order). Moreover, Tenth Circuit case law clearly provides that plaintiff may not recover damages for emotional distress under the ADEA. See Perrell, 726 F.2d at 657; see also Villescas v. Abraham, 311 F.3d 1253, 1259 (10th Cir. 2002) (noting established law that separate damages for emotional distress not available under ADEA); Greene v. Safeway Stores, Inc., 210 F.3d 1237, 1244 (10th Cir. 2000). Plaintiff does not claim any other type of damage as a result of the alleged harassment. Therefore, he cannot prevail on his hostile work environment claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #50) filed June 17, 2005 be and hereby is **SUSTAINED.** The Clerk is directed to enter judgment in favor of defendant on plaintiff's claims.

Dated this 1st day of December, 2005 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

26